UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**PATRICIA LEA CLEMENS**,                                    Civil Case No. 3:11-CV-06118-KI

                    Plaintiff,

                                                            OPINION AND ORDER

            v.

**MICHAEL J. ASTRUE**,
Commissioner of Social Security,

                    Defendant.


        Kathryn Tassinari
        Mark A. Manning
        Harder, Wells, Baron & Manning, P.C.
        474 Willamette, Suite 200
        Eugene, Oregon  97401

                Attorneys for Plaintiff

        S. Amanda Marshall
        United States Attorney
        District of Oregon


Page 1 - OPINION AND ORDER

Adrian L. Brown
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, Oregon 97201-2902

David J. Burdett
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, Washington 98104-7075

     Attorneys for Defendant

KING, Judge:

Plaintiff Patricia Clemens brings this action pursuant to section 205(g) of the Social

Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the

Commissioner denying plaintiff's application for supplemental security income benefits ("SSI").

I reverse the decision of the Commissioner and remand for further proceedings.

## BACKGROUND

Clemens filed an application for SSI on September 9, 2008. The application was denied

initially and upon reconsideration. After a timely request for a hearing, Clemens, represented by

counsel, appeared and testified before an Administrative Law Judge ("ALJ") on January 14,

2010.

On January 28, 2010, the ALJ issued a decision finding that Clemens was not disabled

within the meaning of the Act and therefore not entitled to benefits. This decision became the

final decision of the Commissioner when the Appeals Council declined to review the decision of

the ALJ.

Page 2 - OPINION AND ORDER

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability.  42 U.S.C. § 423(a)(1).  In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act.  42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months.  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability.  The evaluation is carried out by the ALJ.  The claimant has the burden of proof on the first four steps.  Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007), cert. denied, 128 S. Ct. 1068 (2008); 20 C.F.R. §§ 404.1520 and 416.920.  First, the ALJ determines whether the claimant is engaged in "substantial gainful activity."  If the claimant is engaged in such activity, disability benefits are denied.  Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments.  A severe impairment is one "which

significantly limits [the claimant's] physical or mental ability to do basic work activities."  20
C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe impairment or
combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the
impairment is equivalent to one of a number of listed impairments that the Commissioner
acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d)
and 416.920(d).  If the impairment meets or equals one of the listed impairments, the claimant is
conclusively presumed to be disabled.  If the impairment is not one that is presumed to be
disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the
claimant from performing work which the claimant performed in the past.  If the claimant is able
to perform work she performed in the past, a finding of "not disabled" is made and disability
benefits are denied.  20 C.F.R. §§ 404.1520(e) and 416.920(e).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the
fifth and final step to determine if the claimant can perform other work in the national economy
in light of his age, education, and work experience.  The burden shifts to the Commissioner to
show what gainful work activities are within the claimant's capabilities.  Parra, 481 F.3d at 746.
The claimant is entitled to disability benefits only if he is not able to perform other work.  20
C.F.R. §§ 404.1520(f) and 416.920(f).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial
evidence and is based on correct legal standards.  Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1
(9th Cir. 2005).  Substantial evidence is more than a "mere scintilla" of the evidence but less than

a preponderance.  Id.  "[T]he Commissioner's findings are upheld if supported by inferences

reasonably drawn from the record, and if evidence exists to support more than one rational

interpretation, we must defer to the Commissioner's decision."  Batson v. Comm'r of Soc. Sec.

Admin., 359 F.3d 1190, 1193 (9th Cir. 2004) (internal citations omitted).

## THE ALJ'S DECISION

The ALJ found Clemens suffered from the severe impairments of major depression,

anxiety disorder, cognitive disorder, borderline personality disorder, Type II diabetes,

fibromyalgia, rotator cuff syndrome, and obesity.   The ALJ found that these impairments, either

singly or in combination, did not meet or medically equal the requirements of any of the

impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1.

He concluded that Clemens could perform the full range of light work, with the following

limitations:  precluded from overhead reaching, limited to performing simple unskilled tasks in a

set routine, only occasional contact with co-workers, and precluded from contact with the general

public.  Given this residual functional capacity ("RFC"), the ALJ concluded Clemens could

perform work as a folding machine worker, assembler, or electronics worker.

## FACTS

Clemens, who was 46 years old at the time she filed her application, has a GED and very

little work history.  She reported summer work in high school, but she was married for 17 years

to a veteran who insisted she not work so as not to affect his pension.

Clemens has a history of diabetes mellitus and migraines.  She went to the ER in April

2008 for a headache that she said lasted one month.  At that time, she reported a history of

migraines, and that her medications at home normally resolved them. Tr. 210. She had a good range of motion in her neck and ambulated without difficulty.

In June 2008, she was referred to South Coast Orthopaedic Associates for diffuse pain lasting two years. She was attending Curves and was making progress. Her worst pain was in the back of the neck and over her head. Michael L. Pylman, M.D., noted full range of motion in her neck, in her shoulders, elbows and wrists. He noted she could walk forwards, backwards, stand on her toes and heels, and do one-legged deep knee bends. He noted 13/18 positive fibromyalgia tender points, but no discrete trigger points. Dr. Pylman recommended "continued mental health intervention to work on both her mood and to help deal with her chronic pain and PTSD." Tr. 228.

She established care with Bang T. Nguyen, D.O., in July 2008, who began treating her for diabetes mellitus and fibromyalgia. She denied headaches. She reported mood fluctuations and depression. Tr. 233. Dr. Nguyen noted a cervical MRI showed no disc disease or nerve root compression, although it showed thecal sac narrowing, mild at C6-7 and borderline at C4-5 and C5-6, from disc disease. He prescribed Nortriptyline.

Dr. Nguyen reassigned Clemens to Douglas Crane, M.D., in September 2008. Dr. Crane declined to prescribe opiate medications for her fibromyalgia. "She will not be getting any with her level of disease." Tr. 755. She saw Rajesh Ravuri, M.D., the next month. (Notably, in a counseling session in early October, Clemens reported to her therapist, "Saw newly assigned MD and did not think that he would work with her, so she fired him and has a different physician." Tr. 557.) Clemens reported no headaches to Dr. Ravuri; she was taking Topamax for migraines. Dr. Ravuri prescribed Cymbalta and 250 mg of naproxen a day. In December, Dr. Ravuri

reported that Clemens' anxiety and depression was responding to Cymbalta.  Similarly, in

January, her anxiety, depression, and fibromyalgia were well controlled on Cymbalta.  In

February, she did not even mention her anxiety, depression or fibromyalgia.  In June of 2009, she

reported she was working with another provider on her medications to control her anxiety, but

"otherwise says that she is doing very well." Tr. 747.  She complained of leg and right shoulder

pain.  In September 2009, she complained of a 5-day migraine.  She also reported back pain and

pain in her right hand.  Dr. Ravuri prescribed Baclofen for her myalgias and Ultram for her

migraine.

In October 2009, Clemens saw Kamara Dodd, a family nurse practitioner in Dr. Ravuri's

office, who reported that Clemens made an appointment for constipation, heel spur and shoulder

pain, but began talking about several psychosocial issues such as her hirsutism and history of

abuse.  Dodd spent 45 minutes to an hour talking with Clemens about her depression and

thoughts of suicide.  She added Wellbutrin to Clemens' current dose of Cymbalta.  Clemens

reported her depression better controlled with both medications in November.  Similarly, in

December, Clemens reported her anxiety, depression and chronic pain were well-controlled.  She

received a steroid injection for right-shoulder pain.  In February 2010, she reported no change in

her mood or memory.  In July 2010, Dodd noted Clemens showed "appropriate insight and

judgment.  Recent and remote memory is intact.  Mood and affect is calm and appropriate." Tr.

791.  Clemens complained about her fibromyalgia flaring up in September 2010; Dodd increased

her naproxen and Neurontin dosages.  In October 2010, Clemens reported her depression was not

ideally controlled; she was feeling unmotivated and not wanting to get out of bed.  Dodd

increased her Wellbutrin.  In November 2010, Clemens reported her symptoms were better.

Page 7 - OPINION AND ORDER

Finally, in December 2010, she received treatment for a shoulder injury, and Dodd referred her to South Coast Orthopaedics for evaluation of the decreased range of motion.

She has received treatment intermittently from Coos County Mental Health, beginning in July 2002 for depression she reported experiencing her whole life. Tr. 354. In September 2002, Marcia Strickland McDonald, D.O., diagnosed: mood disorder, NOS; rule out major depressive disorder, rule out generalized anxiety disorder, rule out OCD, post traumatic stress disorder ("PTSD), and rule out borderline personality disorder or mixed personality disorder. Clemens began therapy sessions with Alex Shade, a licensed clinical social worker ("LCSW"), in August of 2002 until February 2003, when her insurance co-payment increased. Treatment was thought to be moderately effective.

Clemens and her husband separated and then divorced in 2004, and she began counseling sessions again in October of 2004 with Shade. She attended dialectical behavioral therapy ("DBT") in 2005. Her care was terminated at the conclusion of DBT treatment in February 2006. Shade noted "progress in reducing depression and anxiety" symptoms and her prognosis was "guarded to good." Tr. 316.

Other than a single referral in September 2007 for counseling and medication stabilization, she did not return to Coos County Mental Health until February 2008; at that time she complained of feeling helpless, hopeless, and worthless. Larry Wise, M.D., described Clemens as oriented, in no acute stress, without suicidal or homicidal ideation, with normal insight and judgment, casually dressed and neat, and full range of affect. She maintained eye contact throughout most of the interview. He diagnosed major depression, anxiety disorder, and

personality disorder, with a GAF of 45.[1]  He prescribed Strattera.  He treated her over the course

of four months and expressed skepticism about her symptoms.  He described her "out and about

town" without "any symptomatology" in March 2008 and noted that she "appears to not meet the

treatment team/writer halfway in any treatment goals."  Tr. 625.  He described her in April 2008

as "medication seeking."  Tr. 622.  In May 2008, he noted she was "relatively stable and

somewhat anxious, but does remain somewhat medication seeking."  Tr. 620.  He described her

as "relatively pleased with her current medication schedule and appears more stable now than

when the writer first met her" in June 2008.  Tr. 616.

In September 2008, Clemens met with Marly Kennedy, a psychiatric mental health nurse

practitioner, who evaluated Clemens' psychiatric medications.  Clemens described unhappiness

with all the anti-depressants and anti-anxiety medications she had tried and expressed a desire for

Valium.  Kennedy described Clemens as "not real happy" when Kennedy told her that they do

not prescribe benzodiazipines because of their addictive quality.  Kennedy assigned a GAF of

69,[2] and prescribed Lamictal, a mood stabilizer.

Clemens attended counseling sessions with Tracy Dugan, LCSW, from June through

November 2008, at which time Clemens requested another therapist.  Dugan noted that Clemens

---

[1]The GAF is a scale from 1-100, in ten point increments, that is used by clinicians to determine the individual's overall functioning. A GAF of 41 to 50 means, "**Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job)."  The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV").

[2]A GAF of 61 to 70 means "**Some mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships.**"  DSM-IV.

Page 9 - OPINION AND ORDER

kept her appointments and that prognosis was good if Clemens "would see herself in a more positive light and understand that medication is part of the answer to her problems[,] but . . . needs to be accompanied with exercise, reading, [m]aking an effort to change." Tr. 318.

Clemens started attending DBT again in September 2008. Clemens began therapy with David Bertapelle, LCSW, in late November 2008. His comments related to her poor sleep and that she was regularly attending DBT skills training.

Kennedy evaluated Clemens' medications in November 2008, noting Clemens' report that the Cymbalta took the edge off her constant crying. Clemens described anxiety and flashbacks to her childhood. Kennedy noted a "malingering flavor with this client." Tr. 522.

In March 2009, Clemens met with Rick Staggenborg, M.D., Ph.D., and reported persistent depression with daily thoughts that she would be better off dead. She reported never attempting suicide or making any definite plan. He prescribed Diazepam (brand name, Valium). She reported significant improvement in May 2009.

Penny Palmer, M.D., during a medication management session in August 2009, commented that Clemens has been allowed to "ramble on her past," but that Dr. Palmer's approach was to acknowledge the past and "make an effort to make a more satisfying life and focus on the future." Tr. 674. Dr. Palmer also explained her concern to Clemens about "long-term benzodiazepines" and directed her to take a lower dose. Tr. 674. In November 2009, Dr. Palmer opined that Clemens has a "near pure borderline personality disorder," noting she presents in a histrionic fashion about all the bad things that have happened to her. Tr. 768. Dr. Palmer refused to grant refills of the Diazepam, and terminated care given Dr. Ravuri's involvement.

Page 10 - OPINION AND ORDER

Three physicians and one therapist have offered opinions about Clemens' capabilities. Joshua Boyd, Psy.D., in October 2008, reviewed Clemens' file and identified depression, OCD, PTSD, and cognitive disorder as her primary diagnoses.  Dr. Boyd concluded Clemens would "have difficulty sustaining concentration on detailed tasks," but that she would have no trouble understanding, remembering, and carrying out simple tasks.  Tr. 265.  He opined she should not work with the general public, and only occasionally with co-workers.  He believed she would perform best in an environment that did not have changing job duties.

Also in October 2008, Martin B. Lahr, M.D., M.P.H., reviewed Clemens' file and concluded her primary physical impairment was fibromyalgia.  He thought she could lift 20 pounds occasionally, and 10 pounds frequently, could stand or walk 6 hours in an 8-hour day, and could sit about 6 hours in an 8-hour day.

Dr. Wahl met with Clemens and conducted extensive testing in September 2008.  He noted her arrival 30 minutes early, with good grooming and hygiene, and no gross disturbance of gait or balance.  She reported she "hurt real bad" after about two hours.  Tr. 240.  She cried when talking about her abusive past.  Her IQ fell in the low-average range.  She did well on two of three tasks of attention and concentration, but her poor arithmetic skills lowered her overall score.  Her times on one of the tests was well-within normal limits and indicated good concentration and pace on time limited, relatively simple tasks.  He opined she would have difficulty with complex verbal instructions, but would do well with hands-on learning tasks.  He diagnosed major depressive disorder, obsessive-compulsive disorder, PTSD, cognitive disorder NOS, pain disorder, fibroymyalgia, and assigned a GAF of 50.  He did not think she should have

interaction with the general public or multiple coworkers.  He described her as moderately limited in a number of functional respects.

Finally, Bertapelle concluded that Clemens' PTSD caused sleep disturbance, nightmares, hyper-vigilance, intrusive thoughts, and depression and that she was prevented "from participating in life fully[.]"  Tr. 650.  He found her moderately limited in many functional respects, and markedly limited in her ability to complete a normal workday or workweek without interruptions from her psychological symptoms.

## DISCUSSION

I.     Clemens' Credibility

After summarizing Clemens' complaints about her physical impairments–she cannot lift her right arm higher than her chest, her legs "freeze up," she gets headaches twice a day and "migraines every six months," she has "gastritis, nausea, vomiting, blurred vision, dizziness, and pounding head pain," along with chronic fatigue, and difficulty concentrating–the ALJ concluded that "the persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent" with her ability to perform light work.  Tr. 14.  According to the ALJ, she also complained that "none of her prescribed medications help relieve her symptoms."  Id.

Although this appears to be the extent of the ALJ's credibility assessment, he did note two items later in his opinion.  First, he opined that "[o]nce she began treatment with Mr. Bertapelle, from 2008 through February 2009[,] treatment records cite shopping for clothes, dating, becoming involved with her boyfriend, and improved mood from prescribed Cymbalta contrary to the claimant's testimony."  Id.  Second, the ALJ found an April 2008 emergency room assessment and a July 2008 cervical MRI undermined Clemens' reports of physical

limitations, but both of these occurred prior to her social security application.[3]  He also reported that "in September 2008[,] there was no problem with either the claimant's wa[l]king or ability to balance."  Tr. 15.  As a result, the ALJ found Clemens capable of performing light work.

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis.  In the first stage, the claimant must produce objective medical evidence of one or more impairments which could reasonably be expected to produce some degree of symptom.  Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007).  The claimant is not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom.  In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms.  Id.  The ALJ "must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony."  Holohan v. Massanari, 246 F.3d 1195, 1208 (9th Cir. 2001).  General findings are insufficient to support an adverse credibility determination and the ALJ must rely on substantial evidence.  Id.  "[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each."  Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006).  Additionally,

_____

[3]I point out, however, that the April 2008 report could be relevant to a credibility assessment, if the ALJ accurately characterized the findings.  For example, even though it occurred before her social security application and even though she found it "quite uncomfortable," the fact that she was walking two miles per day is relevant to assessing Clemens' report only five months later that she could only walk 20 steps when there is absolutely no objective medical explanation for her sudden debilitation.  Compare Tr. 226 with Tr. 129.

The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (internal quotations and citations omitted).

The ALJ's credibility analysis is inaccurate and simply too general. He neglected to mention Clemens' reports of pain all over her body from fibromyalgia, he misrepresented migraines "every six months" when she reported migraines "about six times a month," and he neglected to discuss her reports of depression and feelings of "doom." Tr. 40. Further, his entire analysis of her psychiatric impairments hinges on her statement that the medications did not help her. While this statement is unquestionably a reflection on her credibility–when evidence in the record contradicts it–it is too flimsy on its own to undermine all of her testimony about the persistence and extent of her symptoms. Similarly, one notation in September 2008–the only record post-dating her application to which the ALJ referred–that she had no trouble walking or balancing is insufficient to undermine her testimony about the pain caused by fibromyalgia.

Indeed, among the evidence the ALJ might consider are the following reflections on Clemens' credibility:

First, care providers expressed opinions about Clemens' credibility. For example, Kennedy, the psychiatric mental health nurse practitioner at Coos County Mental Health, commented that there was "a malingering flavor with this client." Tr. 367. Additionally, when

Clemens went to the emergency room for migraine treatment, Rohit Nanda, M.D., reported in

April 2008:

> I explained to the patient that following the use of Inapsine and Benadryl she will potentially be drowsy and unstable on her feet for up to 6-8 hours and that I insist that she not drive home.  At first she told us she would call her husband to come pick her up, but after some period of time of waiting for her husband to arrive she then told us she would have her daughter drive her home.  I was quite suspicious with this comment as she never offered her daughter as a driver for the hour she was in the emergency department.  We kept an eye on her as she was discharged home and she did indeed get into her own car and drive herself home.  We notified authorities as she is driving under the influence of several medications that could alter her driving ability and I have explained to her on several occasions while she was in the emergency department that she is absolutely not to drive home and she insisted that she would not; however, she did indeed drive herself home.

Tr. 211.  Dr. Wise repeatedly noted Clemens' behavior as "medication seeking" because he

would not prescribe benzodiazepines–Valium–to her.  Tr. 378 (April 2008); Tr. 376 (May 2008).

Similarly, in September 2008, Dr. Crane wrote, "She is wanting opiate medications.  I refused

this today.  She will not be getting any with her level of disease . . . I think she would find the

opiate medications quite debilitating."  Tr. 755.

Several care providers remarked that Clemens sought excuses from participating in her

work program.  For example, before her onset date of disability, Clemens asked Shade, her

counselor at Coos County Mental Health, "about having a reprieve from work training through

DHS" so that she could work on her mental health problems.  Tr. 479.  A little over a year later,

in August 2006, she went to the emergency room for an ankle sprain.  Alina Dumitrescu, M.D.,

reported, "The patient really wanted to be off work, and I discussed with her that at this point,

with the minimal clinical findings, there is no medical reason for her to be off work."  Tr. 214.

Just before she submitted her social security application, Dr. Wise noted, in March 2008:  "The

patient has been seen out and about town and appears to not have any symptomatology.  The patient requested a note to her work program to be excused.  The writer is not sure if this is a good thing."  Tr. 381.

Finally, Clemens' reports about past abuse are conflicting.  She told Dr. Wahl, on September 24, 2008, that she "remained with her abusive husband, who was 16 years older, for 17 years despite his *physical* beatings, jealousy and constant attempts to control her." Tr. 239 (emphasis added).  Right after her relationship ended, however, in October 2004, she described her husband as "emotionally and financially abusive."  Tr. 334; 331 ("emotionally abusive" in November 2004); see also Tr. 303 ("economic abusive behavior" in February 2008). Indeed, a year after her session with Dr. Wahl, on October 9, 2009, she described the relationship as one of mental and emotional abuse.  Tr. 743.

Furthermore, as early as 2002, when Clemens sought counseling from Coos County Mental Health, she discussed her father's physical and emotional abuse of her as a child. Tr. 348.  Inexplicably, however, in February 2008, when she sought treatment from Coos County Mental Health again after a break in her care, she "denied any physical, mental or sexual abuse." Tr. 303.  At other times, she remembered with vivid detail her father killing a kitten in front of her, Tr. 348 (September 2002), Tr. 367 (November 2008), and described being "quite close" to her brother, Tr. 351 (September 2002), but reported in October 2009 that it was her brother who "killed pets in front of her."  Tr. 743.

In short, there is much for the ALJ to consider regarding Clemens' credibility, but he failed to give clear and convincing reasons for discrediting Clemens' testimony.

II.    Lay Testimony

Page 16 - OPINION AND ORDER

The ALJ neglected entirely to discuss the lay testimony presented by Gary Mickelson, Clemens' boyfriend.  In September 2008, Mickelson reported that he had known Clemens for two and a half years, and that "[h]er pain seems to slow her down.  She seems to suffer from depression, cries frequently."  Tr. 139.  He noted she used to exercise and had more energy, but that now she "[d]oesn't seem to do many activities because of her pain."  Tr. 140.  He also noted her inability to get a good night of sleep.  When she cleaned and did the laundry, he reported she was in pain and was fatigued.  She only went outside twice a week due to her depression.  She still had hobbies, such as sewing, watching television, and going on the internet, and Mickelson noted "no real changes there" from before she began feeling unwell.  Tr. 143.  He thought she had a hard time paying attention and listening, and did not handle stress well.

Lay testimony about a claimant's symptoms is competent evidence which the ALJ must take into account unless he gives reasons for the rejection that are germane to each witness.  Stout v. Comm'r of Soc. Sec. Admin., 454 F.3d 1050, 1053 (9th Cir. 2006).  "[W]here the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination."  Id. at 1056.

The Commissioner recognizes the ALJ erred in failing to discuss the lay testimony, but argues it was harmless error.  In support of that theory, the Commissioner inexplicably relies on Dr. Wahl's opinion that Clemens could follow simple instructions, get along with co-workers, and accept criticism from supervisors, suggesting that Mickelson's lay testimony could not overcome the doctor's conclusion.  However, as I discuss below, the ALJ failed to address Dr.

Wahl's opinion, too.  Furthermore, Dr. Wahl's opinion may be consistent with Mickelson's testimony in many respects, depending on what Dr. Wahl meant by "moderately limited" as I discuss below.  For example, Dr. Wahl found Clemens moderately limited in her ability to maintain attention and concentration for extended periods, perform activities within a schedule, and work in proximity to others without being distracted by them.  Tr. 248.  Accordingly, I could not say that, accepting everything Mickelson said as true, no reasonable ALJ could have reached a different decision.

III.    Medical Source Statements

A.      Dr. Wahl's Opinion

Clemens complains that the ALJ neglected to discuss Dr. Wahl's report, other than reporting the GAF score of 50 that Dr. Wahl assigned.  Clemens concedes the ALJ did implicitly incorporate some of the limitations Dr. Wahl identified, such as limiting Clemens' contact with co-workers and the general public.  However, he did not address any of the other limitations Dr. Wahl found.[4]  For example, Dr. Wahl identified Clemens' functioning as "moderately limited" with respect to maintaining attention for extended periods, performing activities within a schedule, maintaining regular attendance, being punctual, and sustaining an ordinary routine without supervision.  Clemens argues the ALJ was required to give clear and convincing reasons for rejecting this uncontradicted opinion of an examining physician.

---

[4]Clemens argues the ALJ failed to address Dr. Wahl's opinion that Clemens' "abysmal" self-esteem would affect her ability to respond appropriately to supervision.  Pl.'s Op. Mem. 15-16.  However, Dr. Wahl concluded Clemens' self-esteem would only affect her interactions with the general public and co-workers, and he opined she would not be significantly limited in accepting instructions and responding appropriately to criticism from supervisors.  Tr. 248.  As a result, I do not find this as a basis to reverse the ALJ's decision.

The Commissioner responds that applying the functions Dr. Wahl identified as

"moderately limited" would not change the ALJ's conclusion about Clemens' ability to perform

simple, unskilled work.

The weight given to the opinion of a physician depends on whether the physician is a

treating physician, an examining physician, or a nonexamining physician. More weight is given

to the opinion of a treating physician because the person has a greater opportunity to know and

observe the patient as an individual. Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007). If a

treating or examining physician's opinion is not contradicted by another physician, the ALJ may

only reject it for clear and convincing reasons. Id. (treating physician); Widmark v. Barnhart,

454 F.3d 1063, 1067 (9th Cir. 2006) (examining physician). Even if it is contradicted by another

physician, the ALJ may not reject the opinion without providing specific and legitimate reasons

supported by substantial evidence in the record. Orn, 495 F.3d at 632; Widmark, 454 F.3d at

1066. The opinion of a nonexamining physician, by itself, is insufficient to constitute substantial

evidence to reject the opinion of a treating or examining physician. Widmark, 454 F.3d at 1066

n.2.

The parties' dispute comes down to the meaning of "moderately limited," as used by Dr.

Wahl. A moderate limitation, as defined on the form, is one "which *seriously* interferes with the

individual's ability to perform the designated activity on a regular and sustained basis, i.e., 8

hours a day, 5 days a week, or an equivalent work schedule." Tr. 247 (emphasis added).

Clemens transfers this definition into one that means the limitation affects 1/3 of the day, which

the VE testified would preclude the identified jobs. Tr. 50-52 (discussion of "moderately"); cf.

Tr. 651 (slightly different definition in Therapist David Bertapelle's assessment: "Moderately

Limited:  An impairment that seriously limits the ability to function in the designated area (would

*preclude* sustained performance of jobs in which the function is a critical requirement of the

job).”); 20 CFR pt. 404, Subpart. P, App. 1, 12.00 (“A *marked* limitation may arise when several

activities or functions are impaired, or even when only one is impaired, as long as the degree of

limitation is such as to interfere *seriously* with your ability to function independently,

appropriately, effectively, and on a sustained basis.”).

    The Commissioner points to Dr. Wahl’s narrative report and suggests that, in the context

of Dr. Wahl’s findings, “moderately limited” cannot be read to conflict with Clemens’ ability to

perform simple, unskilled work.  After all, Dr. Wahl did not opine that Clemens was unable to

work.  Rather, he identified several tasks that Clemens would be unable to perform:  difficulty

remembering detailed or complex instructions, either spoken or written; inability to perform

simple arithmetic; inability to perform well in jobs requiring contact with the general public or

multiple co-workers.  Dr. Wahl suggested she would do well with hands-on tasks and could

perform time-limited, simple tasks.

    This is not a dispute I can resolve because the ALJ must address Dr. Wahl’s report in the

first instance.  If he rejects any of Dr. Wahl’s conclusions, he must state so explicitly and he must

give clear and convincing reasons that are supported by substantial evidence in the record.[5]  The

---

[5]I note, for example, that there may not be support for Dr. Wahl’s conclusion that
Clemens would be “moderately limited” in her ability to perform activities within a schedule,
maintain regular attendance, and be punctual.  She showed up 30 minutes early for her
appointment and completed testing within normal times.  In addition, there may be a question as
to Dr. Wahl’s conclusion that Clemens was “moderately limited” in her ability to maintain
attention and concentration for extended periods, when her tests scored “well within normal
limits and indicate good concentration and pace for time limited, relatively simple tasks.”  Tr.
241; see also Batson, 359 F.3d at 1195 (ALJ is not required to accept the opinion of a physician,
even a treating physician, if the opinion is “brief, conclusory, and inadequately supported by

ALJ should also seek clarification from Dr. Wahl about whether the doctor intended "moderately limited" to mean Clemens would be unable to perform the task 1/3 of the day, or intended some other measure to assess the level of impairment below "marked."

The ALJ erred in failing to fully address Dr. Wahl's opinion.

B.    Therapist David Bertapelle

The ALJ rejected Bertapelle's conclusion that Clemens is "prevent[ed] . . . from participating in life fully and . . . [is] isolate[d] from most people," as well as his opinion that she is limited in several respects relevant to her ability to work.  Tr. 650.  For example, Bertapelle found Clemens moderately limited–in other words, precluded from sustained performance–in understanding short and simple instructions, performing activities within a schedule, sustaining an ordinary routine, or responding to changes in the work setting.  Tr. 650.  The ALJ found Bertapelle not an acceptable medical source, concluded the form was ambiguous, found Bertapelle's conclusion to be contrary to the weight of the psychiatric opinions, and found that treatment records did not support the identified restrictions.

As an initial matter, the fact that Bertapelle is not considered an acceptable medical source is not a sufficient reason alone to reject Bertapelle's opinion with respect to Clemens' limitations.  20 C.F.R. §§ 404.1513(d), 416.913(d) (other sources may be considered when evaluating severity of impairments).  In considering the opinions of other medical sources, the ALJ should consider:  (1) how long the source has known the claimant and how frequently the source has seen the claimant; (2) whether the opinion is consistent with other evidence; (3) the degree to which the source presents relevant evidence supporting an opinion; (4) how well the

clinical findings").

Page 21 - OPINION AND ORDER

source explains the opinion; and (5) whether the source has a specialty or area of expertise related to the claimant's impairments.  SSR 06-03p.

The ALJ noted these criteria, but, when I drill down on the underlying evidence for the ALJ's conclusions, some of his reasons come up short.  For instance, the ALJ failed to note that Bertapelle found Clemens *markedly* limited in her ability to complete a normal workday and workweek without interruptions from her psychological symptoms.  Additionally, the ALJ did not explain why he found the form ambiguous.  Third, the only other *examining* source who expressed any opinion on Clemens' functional psychological limitations was Dr. Wahl.  As I indicate above, however, Dr. Wahl may agree with many of Bertapelle's conclusions, depending on what Dr. Wahl meant by "moderately limited."

However, during the time Bertapelle was providing treatment, Dr. Ravuri noticed significant improvement in her mental health.  Although Clemens points to another report from Dr. Staggenborg that Clemens continued to have nightmares and slept poorly during the time Bertapelle was counseling Clemens, only two months later, with a change in medication, she reported significant improvement.  Furthermore, Penny Palmer, M.D., criticized the counseling Bertapelle had been providing Clemens and, based on this assessment, the ALJ rejected Bertapelle's opinion.[6]  The ALJ gave sufficient reasons to question Bertapelle's opinion and he did not err.

VI.    Remedy

---

[6]Clemens complains that she was not seeing Dr. Palmer for psychotherapy, but only for medication management.  Regardless, however, Dr. Palmer, as a qualified psychiatrist, could offer her judgment on the efficacy of Clemens' counseling.  However, to the extent the ALJ suggests a borderline personality disorder, diagnosed by Dr. Palmer, is somehow less disabling than depression or anxiety, he should reassess his conclusion.

The court should credit evidence and immediately award benefits if the ALJ failed to provide legally sufficient reasons for rejecting the evidence, there are no issues to be resolved before a determination of disability can be made, and it is clear from the record that the ALJ would be required to find the claimant disabled if the evidence is credited. Varney v. Sec. of Health and Human Servs., 859 F.2d 1396, 1401 (9th Cir. 1988). If this test is satisfied, remand for payment of benefits is warranted regardless of whether the ALJ might have articulated a justification for rejecting the evidence. Harman v. Apfel, 211 F.3d 1172, 1178-79 (9th Cir. 2000); but see Vasquez v. Astrue, 572 F.3d 586, 593 (9th Cir. 2009) (recognizing split within the circuit on whether the "credit as true" rule is mandatory or discretionary but not resolving the conflict).

Given the confusion about Dr. Wahl's opinion, and the fact that, depending on the meaning of "moderately limited," it would not be clear from the record even were I to fully credit that opinion, remand is appropriate. On remand, the ALJ must reassess Clemens' credibility, Mickelson's testimony, and Dr. Wahl's opinion. The ALJ may take additional testimony if deemed helpful.

## CONCLUSION

The decision of the Commissioner is reversed. This action is remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for rehearing to further develop the record as explained above. Judgment will be entered.

IT IS SO ORDERED.

Dated this _____6th_____ day of July, 2012.


        _/s/ Garr M. King_____
        Garr M. King
        United States District Judge